```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                      :
                                                            :    Chapter 11
        TEXSTYLE, LLC,                                      :
           d/b/a TexStyle Home Fashions,                    :    Case No. 11-11686 (SMB)
                                                            :
                            Debtor.                         :
------------------------------------------------------------X
TEXSTYLE, LLC,                                              :
  d/b/a TexStyle Home Fashions,                             :
                                                            :
                            Plaintiff,                      :
                                                            :
        -- against --                                       :    Adv. Proc. No. 11-02265 (SMB)
                                                            :
HARRY GROUP, INC., d/b/a JMKC                               :
EXPRESS,                                                    :
                                                            :
                                                            :
                                                            :
                            Defendant.                      :
------------------------------------------------------------X
```

**MEMORANDUM DECISION GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION
TO VACATE DEFAULT AND COMPEL ARBITRATION**

**A P P E A R A N C E S:**

LAW OFFICES OF THOMAS M GRASSO LLC
Attorneys for Defendant Harry Group, Inc. d/b/a
 JMKC Express
8 Willow Street
Cranford, New Jersey 07016-1855

  Thomas M. Grasso, Esq.
    Of Counsel

SILVERMANACAMPORA LLP
Attorneys for the Debtor
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

  Lon J. Seidman, Esq.
    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

TexStyle, LLC (the "Debtor") filed a complaint, dated June 20, 2011 (the "*Complaint*" (ECF Doc. # 1)),[1] seeking damages and equitable relief against its former warehousing, logistics and distribution services provider, Harry Group, Inc. d/b/a JMKC Express (the "Defendant"). The Defendant defaulted, and now seeks to vacate its default and compel arbitration (the "Motion"). For the reasons that follow, the motion to vacate the Defendant's default is granted, and the motion to compel arbitration is granted in part and denied in part.

## BACKGROUND

### A.    The Prepetition Agreements

The Debtor, a Nevada limited liability company, designs, manufactures and markets home textiles and accessories. (*Complaint* at ¶¶ 5, 8.) The Defendant, a Nevada corporation, provides warehouse management and logistic services. (*Affidavit of Brandon Villardi in Support of JMKC's Motion to Set Aside Default and to Enforce Arbitration Clause*, sworn to Dec. 7, 2011 ("*Villardi Affidavit*"), at ¶¶ 4, 5 (ECF Doc. # 23).) In August 2010, the Debtor and the Defendant entered into a Warehousing and Distribution Service Agreement, dated August 1, 2010 (the "*Agreement*"), for a term of three years.[2] The Defendant agreed to maintain a warehouse (the "Warehouse") to store the Debtor's goods (the "Products"), (*Agreement* at ¶ 1.2), and provide certain services, which generally included maintaining and providing inventory for

---

[1]    Unless otherwise indicated, citations to "ECF" refer to the electronic docket in this adversary proceeding.

[2]    The *Agreement* is annexed as Exhibit B to the *Declaration [of Lon J. Seidman] in Opposition to Defendant's Motion to Vacate Default and Compel Arbitration*, dated Jan. 12, 2012 ("*Seidman Declaration*") (ECF Doc. # 28).

2

the Products, processing orders and shipping and transporting the Products. (*See id.*, Annex 1.1.) The Debtor obligated itself to make minimum monthly payments of $85,000, plus certain percentage increases depending on the volume of sales for a given month. (*Id.* at ¶ 3.1.) The Defendant expressly recognized that "it is critical that Products be shipped on a timely basis," (*Agreement* at ¶ 5.2), agreed to allow the Debtor access, (*id.* at ¶ 4.1), and agreed that the Defendant was precluded from asserting a lien, claim or right of setoff against the Products. (*Id.* at ¶¶ 1.2, 3.2(c).)

The actual services required of the Defendant were detailed in Annex 1.1 to the *Agreement*. The Annex included specific provisions relating to the receipt, handling and storage of the Products, order processing and shipment. The Annex arguably dealt only with shipments to the Debtor's customers and did not address the delivery of the Products to a new warehouseman following termination. Furthermore, the Annex authorized the Defendant to assess additional charges for services that it did not cover.

The *Agreement* also contained an arbitration clause which stated, in pertinent part, that "[a]ny controversy or claim under this Agreement (including, without limitation, any claim for damages arising out of a party's breach of any of the obligations under this Agreement) will be settled by binding arbitration . . . ." (*Id.* at ¶ 6.4.) Finally, the *Agreement* stated that it would be governed by Nevada law. (*Id.* at ¶ 6.7.)

The Defendant simultaneously executed an Acknowledgment of Security Interest and Waiver of Liens, dated August 1, 2010 (the "*Acknowledgment*"), in favor of Wells Fargo Bank, National Association ("Wells Fargo"), the Debtor's secured lender.[3] The *Acknowledgement* was

---

[3] The *Acknowledgement* is annexed as Exhibit C to the *Seidman Declaration*.

3

meant "[t]o induce Wells Fargo . . . to make loans or extend financial accommodations to TexStyle, LLC . . . ." (*Acknowledgment*, first sentence.) Essentially, the Defendant subordinated any possible claim or lien against the Products to those of Wells Fargo, and generally waived its ability to assert a lien, claim, or right of setoff against the Debtor's goods. (*See id.* at ¶¶ 1, 2.) The Debtor was not a party to the *Acknowledgment* but expressly consented to its terms.[4] Lastly, the *Acknowledgement* was governed by Wisconsin law. (*Id.* at ¶ 11.)

Among other things, the *Acknowledgement* granted the Debtor the right, upon written notice, to "at any time require [the Defendant] to return the Goods . . . [and] deliver the Goods as directed in such notice immediately upon receipt of such notice . . . ." (*Id.* at ¶ 6.) It is not clear whether or to what extent the Debtor could enforce these rights. The *Acknowledgment* also stated that it is "intended only for the benefit of Wells Fargo and its affiliates, participants, successors and assigns" and "may be enforced, without further act or notice of acceptance, by Wells Fargo and its affiliates, participants, successors and assigns." (*Id.* at ¶ 11.)

**B.     This Adversary Proceeding**

The Debtor filed a voluntary chapter 11 petition on April 12, 2011. In or around early June, the Debtor decided to change its warehouse and logistics provider to Global One Logistics ("Global One"). The problems the Debtor allegedly encountered with the Defendant after it sought to terminate the *Agreement* and transition to Global One led to this lawsuit. According to the *Complaint*, when the Defendant learned on June 8, 2011, that the Debtor intended to switch to Global One, the Defendant refused to transfer the Debtor's Products unless the Debtor first agreed to fix the amount that the Debtor would pay the Defendant for terminating the *Agreement*

---

[4]     The parties provided a partially executed *Acknowledgement* that did not include a signed copy of the Debtor's consent. Neither side raised this issue, and I assume the *Acknowledgment* was fully executed.

4

early. (*Complaint* at ¶ 24.) On June 16th, one week after the Debtor sent the Defendant a termination notice, representatives of the Debtor appeared at the Warehouse to work out the transition, (*id.* at ¶ 30), but the Defendant denied them access to the Products, called the local police and sought to press charges for trespassing.[5] (*Id.* at ¶¶ 31-32.)

The Debtor filed this adversary proceeding on June 21, 2011, asserting claims sounding in (1) turnover pursuant to 11 U.S.C. § 542, (2) breach of the *Agreement* and the *Acknowledgement*, (3) injunction pursuant to 11 U.S.C. § 105(a), (4) equitable subordination pursuant to 11 U.S.C. § 510(c), and (5) damages and sanctions for willful violation of the automatic stay pursuant to 11 U.S.C. § 362. Although the *Complaint* refers to the June 16th incident, (*Complaint* at ¶¶ 30-32), the gravamen of the Debtor's claims, asserted under both the *Agreement* and the *Acknowledgment*, concern the Defendant's alleged refusal to ship the Products to the Debtor's customers or deliver the Products to Global One on a timely basis. These allegations are largely conclusory, (*see id.* at ¶¶ 20, 25, 36, 38), and the *Complaint* does not identify a specific shipment that the Defendant delayed or refused to make.[6]

Simultaneously with the commencement of the adversary proceeding, the Debtor filed a motion for a preliminary injunction and temporary restraining order, seeking to compel the Defendant to cooperate with transitioning the Products to Global One's warehouse facility. The

---

[5] In prior proceedings, the Defendant offered proof calling into question the Debtor's version of what occurred on June 16, 2011. (*See Declaration of Brandon Villardi in Support of JMKC's Response to Motion for Preliminary Injunction and Temporary Restraining Order*, dated June 21, 2011, at ¶¶ 4-8 (ECF Doc. # 7).)

[6] During the proceedings relating to the temporary restraining order (discussed below), the Debtor offered evidence that the Defendant interfered with a shipment of Products to Anna's Linens on June 17, 2011. (*Declaration of Pat Carew in Support of Motion for Preliminary Injunction and Temporary Restraining Order*, June 20, 2011, at ¶¶ 8, 9 (ECF Doc. # 3).) The Defendant disputed the Debtor's implication, but acknowledged that the Defendant was unable to ship to Anna's Linens on that date. (*Declaration of Rusty Peck in Support of Response to Motion for Preliminary Injunction and Temporary Restraining Order,* dated June 21, 2011, at ¶¶ 12, 13 (ECF Doc. # 8).)

5

Court held a hearing on the temporary restraining order that same day (the "TRO Hearing"). The Defendant appeared through counsel, Daniel F.X. Geoghan, Esq. of Young Conaway Stargatt & Taylor ("Young Conaway"), who filed papers on the Defendant's behalf and attended the hearing.

The immediate dispute was resolved through a direction by the Court, to which the parties consented. The parties would comply with the terms of the *Agreement—i.e.*, the Debtor would resume making payments and the Defendant would resume performance—on a going-forward basis until the Products were transferred from the Warehouse to Global One's facility. (*Transcript of Debtor's Motion for Temporary Restraining Order and Permanent Injunction Before the Honorable Stuart J.* (sic) *Bernstein United States Bankruptcy Judge*, dated June 22, 2011 (Main Case ECF Doc. # 84).) Within six weeks, all of the Products were shipped to customers or delivered to Global One. (*See Villardi Affidavit* at ¶¶ 44, 52 ("On July 28, 2011, the transition of TexStyle's goods out of the Warehouse was complete").)[7]

In the meantime, however, shortly after the TRO Hearing, on June 27, 2011, Young Conaway wrote a letter purporting to withdraw as Defendant's counsel. (*See* Letter from Daniel F. X. Geoghan to the Court, dated June 27, 2011 (ECF Doc. # 11).) The withdrawal was ineffective since it was never presented to or approved by the Court in accordance with its Local Rules. *See* S.D.N.Y. Bankruptcy Court Local Rule 2090-1(e).

---

[7] The transitioning of the Products suggests that the Debtor's turnover claim (First Claim for Relief) and its claim for injunctive relief (Third Claim for Relief) are moot. In addition, the Defendant has not filed a proof of claim, making the Debtor's claim for equitable subordination (Fourth Claim for Relief) unnecessary and untenable. *See Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 451 (Bankr. S.D.N.Y. 2011); *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox, Inc.)*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010).

Abandoned by its counsel, the Defendant dealt directly with the Debtor's counsel, Lon Seidman, Esq., while it tried to secure substitute representation. The Defendant's Operations Manager, Brandon Villardi, and Debtor's counsel exchanged several emails regarding adjournments of the proceedings. (*Villardi Affidavit* at ¶ 53 & Ex. C.) On September 13, 2011, the Court held a pretrial conference, and directed that the Defendant file and serve an answer to the *Complaint* within thirty days, or by October 14, 2011. (*See Order Setting Deadline to Answer Complaint or Move under Rule 7012 of the Federal Rules of Bankruptcy Procedure*, dated September 13, 2011 (ECF Doc. # 12).) On September 20, 2011, the Clerk of the Court issued a second summons and notice of pretrial conference (the "Second Summons"). The Second Summons purported to set a different deadline for answering the *Complaint*, October 20, 2011. The inconsistency did not affect the Defendant because it failed to answer the *Complaint* even by the later date.

As a consequence, on November 15, 2011, the Debtor submitted its request to the Clerk of the Court to certify the Defendant's default. (*See Request to Enter Default*, dated November 15, 2011 (ECF Doc. # 16).) At around the same time, the Defendant retained a new attorney, Thomas M. Grasso, Esq., and Grasso filed an Answer on November 21, 2011.[8] (*See Answer of Harry Group, Inc., d/b/a JMKC Express* (ECF Doc. # 17).) At the pretrial conference on December 1, 2011, which Grasso attended, the Court ruled that although the Clerk had not entered the default, the Defendant was in default and had to make a motion to set the default aside. The Defendant filed the Motion on December 8, 2011, the Court heard oral argument, on January 26, 2012, and reserved decision.

---

[8] Mr. Grasso was formerly substituted for Young Conaway by order dated December 8, 2011. (*See Consent Order Granting Substitution of Attorney* (ECF Doc. # 22).)

7

## DISCUSSION

**A.     Request to Vacate the Default**

Rule 55(c) of the Federal Rules of Civil Procedure allows a court to set aside the entry of default for "good cause." [9] "Under Rule 55(c), the factors governing whether a party should be relieved from default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1138 (2d Cir. 1987); *accord In re Chalasani*, 92 F.3d 1300, 1307 (2d Cir. 1996); *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). [10] The standards for setting aside a default or a default judgment are the same, but courts apply them more rigorously in the case of a default judgment because the latter more deeply implicates the concepts of finality and litigation repose. *Enron Oil Corp.*, 10 F.3d at 96; *American Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir. 1996); *see Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir. 1981) (describing the standard under Rule 55(c) as "lenient"). Although a defendant is not free to flout the rules of procedure without consequence, defaults are generally disfavored, and there is a "strong preference for resolving disputes on their merits." *Sony Corp. v. Elm State Electronics, Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *accord Enron Oil Corp.*, 10 F.3d at 96. ("[W]hen doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party."); *Meehan v. Snow*, 652 F.2d at 277 ("While courts are entitled to enforce compliance with the time limits of the Rules by

---

[9]     Rule 55(c) states: "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Rule 55(c) is made applicable to this adversary proceeding by FED. R. BANKR. P. 7055.

[10]    A court may also consider other relevant equitable factors, such as whether the failure to follow a rule of procedure was a mistake made in good faith, and whether the entry of default would lead to a harsh result. *See Enron Oil Corp.*, 10 F.3d at 96.

8

various means, the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort.")

### 1. Willfulness

"Willfulness" refers to conduct that is deliberate, *see Gucci Am., Inc. v. Gold Center Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998) *cert. denied*, 525 U.S. 1106 (1999), as opposed to negligent or careless. *SEC v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998), *cert. denied*, 525 U.S. 931 (1998); *American Alliance Ins. Co.*, 92 F.3d at 61. Here, the Defendant's default was not deliberate; never ignored the litigation working diligently to resolve the business issues. After the Defendant's original lawyer quit, the Defendant's Operations Manager, Brandon Villardi, dealt directly with the Debtor's attorney to adjourn the hearings scheduled in the adversary proceeding while the Defendant addressed the transition problems with the Debtor.

In the meantime, Villardi actively sought substitute counsel. He contacted the Defendant's local California counsel shortly after receiving the Second Summons, and local counsel advised Villardi to retain a lawyer in New York. (*See Villardi Affidavit* at ¶ 61.) On September 29, 2011, Villardi contacted a relative, Dawn Farinella, Esq., who practices law in New York, and sent her the Second Summons and Complaint. (*Id.* at ¶ 62.) He testified that he followed up with Farinella on four separate occasions in October, but on October 20 she informed him that Seidman refused to grant an extension of time to answer the *Complaint*. (*Id.* at ¶¶ 63, 64.) Following these exchanges, Farinella informed Villardi that she could not represent the Defendant and suggested two other attorneys. (*Id.* at ¶¶ 65, 66.) Villardi contacted one of the recommended attorneys the next business day, but determined that the Defendant could not afford to hire him. (*Id.* at ¶¶ 67, 68.) Villardi contacted Grasso on November 13, and by November 21, 2011, Grasso had filed the Defendant's Answer. (*Id.* at ¶¶ 69-74.)

9

The foregoing demonstrates that the Defendant's default was not willful.

### 2. Prejudice

Legal prejudice occurs when the non-defaulting party's ability to proceed with its case has been impaired. *See MacEwen Petroleum, Inc. v. Tarbell*, 173 F.R.D. 36, 40 (N.D.N.Y. 1997), *appeal dismissed*, 136 F.3d 263 (2d Cir. 1998). Delay alone does not constitute prejudice. *Enron Oil Corp.*, 10 F.3d at 98. Rather, the delay must "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (internal quotation marks omitted).

Here, there is no evidence of legal prejudice. In fact, the Debtor essentially conceded the absence of prejudice in its opposition to the Defendant's motion. (*See Debtor's memorandum of Law in Opposition to Defendant's Motion to Vacate Default and Compel Arbitration*, dated Jan. 12, 2012, at 8 (ECF Doc. # 27).) Although prosecuting this adversary proceeding will inconvenience the Debtor, no evidence has been lost or compromised as a result of the delay.

### 3. Meritorious Defense

Although the movant need not establish a meritorious defense conclusively, it "must present evidence of facts that, if proven at trial, would constitute a complete defense." *McNulty*, 137 F.3d at 740 (internal quotation marks omitted); *accord Sony Corp.*, 800 F.2d at 320-21. Conclusory denials or statements lacking factual support are insufficient. *See Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 173 (2d Cir. 2001); *Enron Oil Corp.*, 10 F.3d at 98; *Sony Corp.*, 800 F.2d at 320.

As noted, the gravamen of the Debtor's claim is the Defendant's alleged failure to promptly ship the Products to the Debtor's customers or deliver them to Global One in

10

connection with the transition. The Defendant has submitted two declarations that undercut the Debtor's conclusory allegations that the Defendant failed to ship or deliver the Products in a timely manner. Villardi testified that "from the inception of the Contract on August 1, 2010, to June 9, 2011, the date of TexStyle's Notice of Termination, no events occurred that would trigger TexStyle's right of immediate termination," (*Villardi Affidavit* at ¶ 18); no claims were ever submitted to the Defendant regarding its performance under the *Agreement*, (*id.* at ¶ 19), or that it "missed any Ready Dates or Required Dates for goods ordered by TexStyle's customers," (*id.* at ¶ 20); and the Debtor never put the Defendant on notice of any canceled customer orders or of any chargebacks assessed by customers. (*Id.* at ¶¶ 21, 22.)

The Defendant has also submitted the declaration of Rusty Peck, its Shipping Manager. (*See Declaration of Rusty Peck in Support of Reply to TexStyle's Opposition to JMKC's Motion to Set Aside Default and to Enforce Arbitration Clause*, dated January 17, 2012 ("*Peck Declaration*") (ECF Doc. # 31).) Peck annexed the Defendant's "Bill of Lading Log" for TexStyle to his Declaration, which, according to Peck, depicts all motor carrier shipments that departed from the Warehouse for the period between January and July of 2011.[11] Peck testified that "JMKC did not receive any claims or complaints for late or untimely deliveries;" did not "miss any Ready Dates or Required Dates for goods ordered by customers for any of the shipments set forth in the [Bill of Lading Log]," nor did any customer orders get canceled as a result of JMKC. (*Peck Declaration* at ¶¶ 5, 6.)

---

[11] The Bill of Lading Log is annexed as Exhibit A to the *Peck Declaration*. In his declaration, Peck attests that he is the custodian of the Bill of Lading Log and it is part of his daily responsibilities to keep it up to date and accurate. (*Peck Declaration* at ¶ 3.)

11

The only specific shipment mentioned in the earlier submissions concerned Anna's Linens. They were not repeated in connection with the pending motions. Based on the foregoing, the Defendant has established a meritorious defense, its default is vacated, and its Answer is accepted by the Court.

**B.     Arbitration**

   **1.     Introduction**

The Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 1 *et seq.*, requires a federal court to enforce an arbitration agreement and stay litigation that contravenes it. *See* 9 U.S.C. §§ 2, 3;[12] *Burns v. New York Life Ins. Co.*, 202 F.3d 616, 620 (2d Cir. 2000). The FAA signifies a "congressional declaration of a liberal federal policy favoring arbitration agreements," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011).

The policy favoring arbitration is so strong that "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute

---

[12]     Section 2 of the FAA states:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 3 states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

but not to the arbitration agreement." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20; *accord Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985) ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation."). Faced with a motion to compel arbitration, a court must apply a four part test: (1) did the parties agree to arbitrate, (2) does the dispute fall within their arbitration clause, (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable, and (4) if the court concludes that some but not all of the claims are arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration? *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir. 1987); *accord Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998); *Vander v. Epana Networks, Inc.*, No. 09 Civ. 4526 (LMM), 2009 WL 2365236, at *2 (S.D.N.Y. Aug. 3, 2009).

The Debtor does not dispute that the claims under the *Agreement* are covered by the arbitration clause. Instead, it argues that the Defendant waived its right to arbitrate by virtue of its delay and participation in this adversary proceeding, and even in the absence of a waiver, the claims asserted under the *Acknowledgment*, which does not contain an arbitration clause, are not arbitrable.

### 2. Waiver

The existence or nonexistence of a waiver is a question of law that must be decided in the context of the case "with a healthy regard for the policy of promoting arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995); *accord PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997). The factors that the court must consider include

> (1) the time elapsed from the commencement of litigation to the request for arbitration, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice. There is no bright-line rule, however, for determining when a party has waived its right to arbitration: the determination of waiver depends on the particular facts of each case.

*PPG Indus.*, 128 F.3d at 107-08; *accord Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 163 (2d Cir. 2000).

These factors weigh against finding a waiver. The Debtor commenced this adversary proceeding in June 2011, and the Defendant filed an answer in November 2011 asserting an arbitration defense. The reason for the delay in asserting the right to arbitration was the same as the delay in filing the answer. The Defendant's original lawyer withdrew after approximately ten days in the case, and it took the Defendant until November to find substitute counsel.

Furthermore, the delay in seeking arbitration does not create a waiver unless the delay prejudices the opposing party. *Leadertex*, 67 F.3d at 25. Prejudice in this context "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997). "Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver." *PPG Indus.*, 128 F.3d at 107; *Leadertex*, 67 F.3d at 26 ("[P]retrial expense and delay—unfortunately inherent in litigation—without more, do not constitute prejudice sufficient to support a finding of waiver.")

The Debtor has not been prejudiced because the activity in this case has been minimal. No discovery has taken place, *cf. PPG Indus.*, 128 F.3d at 109 ("We have held that sufficient prejudice to sustain a finding of waiver exists when a party takes advantage of pre-trial discovery

14

not available in arbitration."), the motion for the preliminary injunction was resolved consensually on the first day and nothing else has been litigated (other than the Motion) or decided. Ironically, had the Defendant insisted on arbitration when the case was commenced, the prompt resolution sought and achieved by the Debtor might never have occurred or been substantially delayed. Accordingly, the Court concludes that the Defendant has not waived its right to arbitration, and is entitled to arbitrate all claims and controversies under the *Agreement*.

Although the parties have not distinguished among the claims, this conclusion also applies to the claim for the violation of the automatic stay asserted in the Fifth Claim for Relief. In *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006), the Second Circuit Court of Appeals considered the question. Prior to bankruptcy, Hill authorized her bank (MBNA) to deduct $159.01 from her account each month to pay down an outstanding debt. *Id.* at 106. After she filed her petition, MBNA continued to withdraw monies from her account to satisfy the pre-petition debt. *Id.* Hill filed a class action complaint against MBNA based on the violation of the automatic stay. *Id.* Hill's agreement with MBNA contained a clause mandating that any claim or dispute arising from or relating to the parties' agreement, including disputes arising under statutes, must be arbitrated. *Id.* at 106-07.

The Second Circuit reversed the lower court decisions denying arbitration of the claim. The Court first reviewed the policy underlying the enforcement of arbitration clauses and the burden of the party opposing arbitration of statutory rights. *Id.* at 107-08. The Court then considered the bankruptcy-specific issues. "Bankruptcy courts generally do not have discretion to refuse to compel arbitration of 'non-core' bankruptcy matters, or matters that are simply 'related to' bankruptcy cases." *Id.* at 108. While they have discretion to refuse to compel arbitration of core matters, "even as to core proceedings, the bankruptcy court will not have

15

discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code." *Id.*; *accord In re U.S. Lines, Inc.,* 197 F.3d 631, 640 (2d Cir.1999). The relevant bankruptcy objectives include the " 'the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.' " *MBNA America Bank*, 436 F.3d at 108 (quoting *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1069 (5th Cir.1997)). "If a severe conflict is found, then the court can properly conclude that, with respect to the particular Code provision involved, Congress intended to override the Arbitration Act's general policy favoring the enforcement of arbitration agreements." *Id.*

The Court agreed that Hill's claim under Bankruptcy Code § 362(h) was core, *id.*, but concluded that arbitration of the claim would "not seriously jeopardize" the objectives of the Bankruptcy Code. The resolution of the dispute would not interfere with or affect the distribution of the estate. Her estate had been fully administered and her case had been closed. She had received a discharge and the arbitration would not affect her fresh start. Any damage award would inure to her personal benefit, not to the benefit of her creditors. In addition, as a purported class action, her claims lacked a direct connection with her bankruptcy case. Finally, the bankruptcy court was not uniquely able to interpret and enforce the automatic stay. *Id.* at 109-110.

As in the case of Hill, the Debtor's Fifth Claim for Relief is core "because [it] derive[s] directly from the Bankruptcy Code and can be brought only in the context of a bankruptcy case."

16

*Id.* at 109. Unlike *Hill*, the Debtor cannot invoke 11 U.S.C. § 362(h), which is available only to individual debtors, but can seek to punish the violator through contempt proceedings. *Maritime Asbestosis Legal Clinic v. LTV Steel Co, Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-87 (2d Cir. 1990).

Although the Debtor's damage claim based on a stay violation has a much closer connection to the case, the Debtor has failed to sustain its burden that arbitration of the claim will seriously jeopardize the objectives of the Bankruptcy Code. The Debtor has confirmed its plan, and hence, arbitration will not interfere with the administration of the case. Any alleged violations stopped long ago; the Debtor and the Defendant have ended their business relationship, and the Debtor's Products have been transitioned to Global One. Although the proceeds of any recovery would be property of the estate and available to creditors, there is no suggestion that the outcome will have a material effect on distributions. And as the *MBNA* Court explained, this Court is not uniquely situated to interpret the automatic stay.

Finally, the stay violation claim is inextricably intertwined with the breach of contract claim under the *Agreement*, which is undeniably arbitrable. The Debtor alleges that "[t]he Defendant has willfully violated the automatic stay by attempting to maintain possession and control over the Debtor's Goods, which are property of the Debtor's estate." (*Complaint* at ¶ 34, p. 8.) These appear to be the same charges that underlie the claim that the Defendant breached the *Agreement* by failing to ship the Products to the customers or deliver the Products to Global One in a timely manner. The disposition of the Products is governed by the *Agreement* and the extent of any violative conduct may coincide with any breach of contract by the Defendant. Put differently, if the Defendant shipped or did not ship or deliver Products in accordance with the *Agreement*, it is hard to see how it could be liable for a violation of the automatic stay.

17

3. The *Acknowledgement*

The questions raised in connection with the Debtor's claims under the *Acknowledgment* are more difficult to answer. The *Acknowledgment* does not contain an arbitration clause, and the Debtor is not even a party the *Acknowledgment*. Moreover, although the *Acknowledgment* grants the Debtor certain rights, the negating language implies that the Debtor is not a third party beneficiary with the right to assert claims under the *Acknowledgment*. The Defendant, for its part, relied on New York law in arguing that the Debtor was not a third-party beneficiary of the *Acknowledgement*, (*see Memorandum of Law in Reply to TexStyle's Opposition to the Motion by Harry Group, Inc. to Set Aside Default Pursuant to BR 7055/FRCP 55(c) and to Enforce an Arbitration Clause*, dated Jan. 17, 2012, at 17 (ECF Doc. # 29)), but the *Acknowledgement* is governed by Wisconsin law.

In light of the state of the record, the Court will stay any claims under the *Acknowledgement* pending the results of the arbitration. Courts have the inherent power to grant a discretionary stay of a proceeding pending arbitration, *Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 225 (2d Cir.1991), where there are issues common to the arbitration and the court proceeding, and those issues may be determined by the arbitration. *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir.1991); *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F.Supp. 499, 502 (S.D.N.Y.1995); *Kittay v. Landegger, et al. (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 199 (Bankr.S.D.N.Y.2002).[13]

---

[13] An arbitration proceeding may form the predicate for collateral estoppel. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

Here, the Debtor made no effort to distinguish between its breach of contract claims under the *Acknowledgement* and the *Agreement*. (*See Complaint* at ¶ 38.) The resolution of the *Agreement* claims may resolve the analogous claims under the *Acknowledgement* to the extent the Debtor can assert them. The stay of these claims is without prejudice to the Defendant's right to make a separate motion to dismiss the claims asserted under the *Acknowledgement* for the reasons stated.

In conclusion, the Defendant's motion to vacate its default is granted, its motion to compel arbitration is granted with respect to all claims under the *Agreement*, and the claims under the *Acknowledgement* are stayed pending the completion of the arbitration without prejudice to the Defendant's right to move to dismiss those claims. The Court has considered the parties' remaining arguments not specifically addressed and concludes that they lack merit. Settle order on notice.

Dated: New York, New York
       April 17, 2012

                                                      /s/ *Stuart M. Bernstein*
                                                      STUART M. BERNSTEIN
                                                      United States Bankruptcy Judge